# UNITED STATES DISTRICT COURT
# DISTRICT OF DELAWARE

| | |
|---|---|
| ERIC SABATINI, Individually and On Behalf of All Others Similarly Situated, ) ) ) | |
| Plaintiff, ) ) | Case No. _____ |
| v. ) ) | JURY TRIAL DEMANDED |
| CONDOR HOSPITALITY TRUST, INC., J. WILLIAM BLACKHAM, DANIEL R. ELSZTAIN, DONALD J. LANDRY, DAPHNE J. DUFRESNE, THOMAS CALAHAN, BRENDAN MACDONALD, BENJAMIN WALL, NOAH DAVIS, MATIAS I. GAIVIRONSKY, NHT OPERATING PARTNERSHIP, LLC, NHT REIT MERGER SUB, LLC, NHT OPERATING PARTNERSHIP II, LLC, and CONDOR HOSPITALITY LIMITED PARTNERSHIP, ) ) ) ) ) ) ) ) ) ) ) ) ) | CLASS ACTION |
| Defendants. ) | |

## COMPLAINT FOR VIOLATION OF THE SECURITIES EXCHANGE ACT OF 1934

Plaintiff, by his undersigned attorneys, for this complaint against defendants, alleges upon personal knowledge with respect to himself, and upon information and belief based upon, *inter alia*, the investigation of counsel as to all other allegations herein, as follows:

## NATURE OF THE ACTION

1.  This action stems from a proposed transaction announced on July 22, 2019 (the "Proposed Transaction"), pursuant to which Condor Hospitality Trust, Inc. ("Condor" or the "Company") will be acquired by affiliates of NexPoint Hospitality Trust (such affiliates collectively referred to herein as "NexPoint").

2.  On July 19, 2019, Condor's Board of Directors (the "Board" or "Individual Defendants") caused the Company to enter into the Merger Agreement with NHT Operating

Partnership, LLC, NHT REIT Merger Sub, LLC, NHT Operating Partnership II, LLC, and Condor Hospitality Limited Partnership.  Pursuant to the terms of the Merger Agreement, Condor's stockholders will receive $11.10 in cash for each share of Condor they own.

3.      On August 9, 2019, defendants filed a proxy statement (the "Proxy Statement") with the United States Securities and Exchange Commission (the "SEC") in connection with the Proposed Transaction.

4.      The Proxy Statement omits material information with respect to the Proposed Transaction, which renders the Proxy Statement false and misleading.  Accordingly, plaintiff alleges herein that defendants violated Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 (the "1934 Act") in connection with the Proxy Statement.

## JURISDICTION AND VENUE

5.      This Court has jurisdiction over the claims asserted herein pursuant to Section 27 of the 1934 Act because the claims asserted herein arise under Sections 14(a) and 20(a) of the 1934 Act and Rule 14a-9.

6.      This Court has jurisdiction over defendants because each defendant is either a corporation that conducts business in and maintains operations within this District, or is an individual with sufficient minimum contacts with this District so as to make the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

7.      Venue is proper under 28 U.S.C. § 1391(b) because a substantial portion of the transactions and wrongs complained of herein occurred in this District.

## PARTIES

8.      Plaintiff is, and has been continuously throughout all times relevant hereto, the owner of Condor common stock.

9. Defendant Condor is a Maryland corporation and a party to the Merger Agreement. Condor's common stock is traded on the New York Stock Exchange American under the ticker symbol "CDOR."

10. Defendant J. William Blackham is Chief Executive Officer and a director of the Company.

11. Defendant Daniel R. Elsztain is a director of the Company.

12. Defendant Donald J. Landry is a director of the Company.

13. Defendant Daphne J. Dufresne is Chair of the Board of the Company.

14. Defendant Thomas Calahan is a director of the Company.

15. Defendant Brendan MacDonald is a director of the Company.

16. Defendant Benjamin Wall is a director of the Company.

17. Defendant Noah Davis is a director of the Company.

18. Defendant Matias I. Gaivironsky is a director of the Company.

19. The defendants identified in paragraphs 10 through 18 are collectively referred to herein as the "Individual Defendants."

20. Defendant NHT Operating Partnership, LLC is a Delaware limited liability company and a party to the Merger Agreement.

21. Defendant NHT REIT Merger Sub, LLC is a Delaware limited liability company and a party to the Merger Agreement.

22. Defendant NHT Operating Partnership II, LLC is a Virginia limited liability company and a party to the Merger Agreement.

23. Defendant Condor Hospitality Limited Partnership is a Virginia limited partnership and a party to the Merger Agreement.

## CLASS ACTION ALLEGATIONS

24. Plaintiff brings this action as a class action on behalf of himself and the other public stockholders of Condor (the "Class"). Excluded from the Class are defendants herein and any person, firm, trust, corporation, or other entity related to or affiliated with any defendant.

25. This action is properly maintainable as a class action.

26. The Class is so numerous that joinder of all members is impracticable. As of July 16, 2019, there were approximately 11,915,954 shares of Condor common stock outstanding, held by hundreds, if not thousands, of individuals and entities scattered throughout the country.

27. Questions of law and fact are common to the Class, including, among others, whether defendants will irreparably harm plaintiff and the other members of the Class if defendants' conduct complained of herein continues.

28. Plaintiff is committed to prosecuting this action and has retained competent counsel experienced in litigation of this nature. Plaintiff's claims are typical of the claims of the other members of the Class and plaintiff has the same interests as the other members of the Class. Accordingly, plaintiff is an adequate representative of the Class and will fairly and adequately protect the interests of the Class.

29. The prosecution of separate actions by individual members of the Class would create the risk of inconsistent or varying adjudications that would establish incompatible standards of conduct for defendants, or adjudications that would, as a practical matter, be dispositive of the interests of individual members of the Class who are not parties to the adjudications or would substantially impair or impede those non-party Class members' ability to protect their interests.

30. Defendants have acted, or refused to act, on grounds generally applicable to the Class as a whole, and are causing injury to the entire Class. Therefore, final injunctive relief on

behalf of the Class is appropriate.

## SUBSTANTIVE ALLEGATIONS

*Background of the Company and the Proposed Transaction*

31.     Condor is a self-administered real estate investment trust that specializes in the investment and ownership of upper midscale and upscale, premium-branded, select-service, extended-stay, and limited-service hotels in the top 100 Metropolitan Statistical Areas ("MSAs") with a particular focus on the top twenty to sixty MSAs.

32.     The Company currently owns fifteen hotels in eight states. Condor's hotels are franchised by a number of the industry's most well-regarded brand families including Hilton, Marriott, and InterContinental Hotels Group.

33.     On July 19, 2019, Condor's Board caused the Company to enter into the Merger Agreement.

34.     Pursuant to the terms of the Merger Agreement, Condor's stockholders will receive $11.10 in cash for each share of Condor they own.

35.     According to the press release announcing the Proposed Transaction:

> NexPoint Hospitality Trust (TSXV: NHT.U) ("NHT") and Condor Hospitality Trust, Inc. (NYSE American: CDOR) ("Condor") today announced the execution of a definitive agreement (the "Merger Agreement"), under which NHT's operating partnership, NHT Operating Partnership, LLC ("NHT OP"), will acquire all of the outstanding equity interests of Condor and its operating partnership by merger. The total consideration payable pursuant to the transaction is approximately US$318 million, which will be satisfied by a combination of cash and debt, including the assumption of certain debt.
>
> Transaction Highlights
>
> •   In line with NHT's growth strategy, NHT will acquire 15 select-service and extended stay hospitality properties, representing 1,908 guestrooms across eight U.S. states (the "Portfolio").

- The transaction will expand NHT's geographic footprint into Georgia, Kansas, Kentucky, Maryland, Mississippi and South Carolina and increase its presence in Florida and Texas.

- Following closing of the transaction, NHT's gross asset value is expected to increase to approximately US$700 million.

- The merger consideration of US$11.10 per share to be paid to holders of shares of common stock represents a premium of approximately 34% over Condor's unaffected share price of US$8.27 as of July 19, 2019, the most recent trading day before the public announcement of the proposal to acquire Condor. . . .

Advisors

KeyBanc Capital Markets, Inc. is acting as financial advisor to Condor. Winston & Strawn LLP and Goodmans LLP are acting as legal counsel to NHT and McGrath North Mullin & Kratz, PC LLO is acting as legal counsel to Condor.

36. The Merger Agreement contains a "no solicitation" provision that prohibits the Individual Defendants from soliciting alternative proposals and severely constrains their ability to communicate and negotiate with potential buyers who wish to submit or have submitted unsolicited alternative proposals. Section 5.2(a) of the Merger Agreement provides:

Except as expressly permitted by this Section 5.2, the Company shall, and shall cause each of its Subsidiaries and its and their respective employees, officers, and trustees, directors or equivalents (collectively, the "Representatives"), and shall instruct and use its reasonable best efforts to cause its and their other Representatives to:

(i) immediately cease any existing solicitations, discussions or negotiations with any Person (other than the Parent Parties and their respective Representatives) that may be ongoing with respect to any inquiry, proposal, offer, indication of interest, discussion or request for nonpublic information from a Third Party that constitutes, or could be reasonably expected to lead to, an Acquisition Proposal (an "Inquiry") or any Acquisition Proposal;

(ii) request the prompt return or destruction (to the extent provided for by the applicable confidentiality agreement) of all confidential information previously furnished to any Person (other than the Parent Parties and their respective Representatives) that has, within the one-year period prior to the date of this Agreement, received confidential information concerning the Company and of its Subsidiaries in connection with a potential strategic transaction with the Company;

(iii) terminate access by any Person and its Representatives (other than the Parent Parties and their respective Representatives) to any online or other data rooms containing any confidential information in respect of the Company and its Subsidiaries; and

(iv) from and after the date of this Agreement until the earlier of the Effective Time and date, if any, on which this Agreement is terminated pursuant to Section 7.1, subject to the other provisions of this Section 5.2, not directly or indirectly, (A) solicit, initiate, induce, propose or knowingly encourage or facilitate any Inquiry or the making, submission or announcement of any proposal that constitutes, or could reasonably be expected to lead to, an Acquisition Proposal, (B) furnish or otherwise provide access to non-public information regarding any Acquired Company, or afford access to the business, employees, officers, Contracts, properties, assets, books or records of any Acquired Company, to any Person in connection with or in response to an Inquiry or an Acquisition Proposal, (C) participate in or knowingly facilities any discussion or negotiations with any Person with respect to an Acquisition Proposal (other than informing such Persons of the provisions contained in this Section 5.2), (D) approve, adopt, authorize, enter into, or propose publicly to approve, adopt, authorize or enter into any a letter of intent, memorandum of understanding, agreement in principle, merger agreement, acquisition agreement, option agreement, joint venture agreement, partnership agreement or other similar agreement or Contract constituting or relating directly or indirectly to, or that contemplates or is intended or could reasonably be expected to result directly or indirectly in, an Acquisition Proposal (other than an Acceptable Confidentiality Agreement), (E) approve, endorse, accept or adopt or recommend the approval, acceptance or adoption of, or make or authorize any public statement, recommendation or solicitation in support of, any Inquiry or Acquisition Proposal, (F) withhold, withdraw, qualify or modify in a manner adverse to the Parent Parties the Company Board Recommendation, it being understood that neither (1) the determination in and of itself by the Company Board that an Acquisition Proposal constitutes, or could reasonably be expected to lead to, a Superior Proposal; nor (2) the delivery in and of itself by the Company to Parent of any notice contemplated by Section 5.2(c) will constitute a Change in Recommendation or violate this Section 5.2(a)(iv)(F), or (G) authorize, resolve, publicly propose or commit to take any of the actions referred to in clauses (A), (B), (C), (D), (E) or (F) of this sentence.

37.     Additionally, the Company must promptly advise NexPoint of any proposals or

inquiries received from other parties. Section 5.2(c) of the Merger Agreement states:

If the Company receives an Acquisition Proposal or Inquiry, then the Company shall:

(i) promptly (and in no event later than one Business Day after receipt of such Acquisition Proposal or Inquiry): (A) notify Parent in writing of the receipt of such

Acquisition Proposal or Inquiry; (B) the identity of the Person making such Acquisition Proposal or Inquiry; (C) indicate the material terms and conditions of such Acquisition Proposal or Inquiry, to the extent known, and (D) provide to Parent an unredacted copy of (including unredacted any materials related to any proposed financing commitments with respect thereto (it being understood that the Company shall provide a written summary of all material terms of any such financing commitments that, pursuant to the terms of the engagement letter with the financing source thereto, cannot be provided in unredacted form)) and any material documentation or correspondence that set forth any such material terms and conditions;

(ii) on a concurrent basis, provide to Parent any non-public information concerning the Acquired Companies that may be provided (pursuant to Section 5.2(b)) to any other Person in connection with any such Acquisition Proposal or Inquiry that has not previously been provided to Parent;

(iii) keep Parent reasonably informed, on a prompt and timely basis, of any material change to the status of the Acquisition Proposal or Inquiry, and shall provide Parent with unredacted copies of all amendments or supplements thereto (including unredacted copies of any materials relating to any proposed financing commitments with respect thereto (it being understood that the Company shall provide a written summary of all material terms of any such financing commitments that, pursuant to the terms of the engagement letter with the financing source thereto, cannot be provided in unredacted form)) and any material documentation or correspondence that set forth any such material terms and conditions, and the general status of any discussions and negotiations with respect to such Acquisition Proposal or Inquiry; provided, further, that neither the Company nor any of its Subsidiaries shall, after the date of this Agreement, enter into any confidentiality or similar agreement that would prohibit it from providing such information to Parent; and

(iv) (A) as promptly as reasonably practicable (and in any event concurrently with notice to the Company Board) notify Parent, orally and in writing, of any scheduled meeting of the Company Board at which it is reasonably likely that the Company Board will consider any Acquisition Proposal or Inquiry; and (B) as promptly as reasonably practicable (and in any event within one Business Day) notify Parent of any determination by the Company Board that an Acquisition Proposal constitutes a Superior Proposal.

38.     Moreover, the Merger Agreement contains a "fiduciary out" provision permitting the Board to change its recommendation of the Proposed Transaction under extremely limited circumstances, and grants NexPoint a "matching right" with respect to any "Superior Proposal" made to the Company. Section 5.2(e) of the Merger Agreement provides:

8

Notwithstanding anything to the contrary contained in this Agreement:

(i) at any time prior to the earlier of (x) obtaining the Company Shareholder Approval and (y) 30 days following the date of this Agreement, the Company Board may make a Change in Recommendation and terminate this Agreement pursuant to Section 7.1(h) if and only if: (A) an unsolicited bona fide written Acquisition Proposal (provided that the Acquisition Proposal did not result from or arise in connection with a breach or violation of this Section 5.2) is made to the Company and not withdrawn; (B) the Company Board has determined in good faith after consultation with the Company's outside legal counsel and financial advisor, (1) that such Acquisition Proposal constitutes a Superior Proposal and (2) failure to make a Change in Recommendation and terminate this Agreement pursuant to Section 7.1(h), would reasonably be expected to constitute a breach of the Company Board's duties set forth in Section 2-405.1 of the MGCL; (C) the Company delivers to Parent a written notice (a "Superior Proposal Notice") that includes (1) a statement that the Company Board intends to make a Change in Recommendation and terminate this Agreement pursuant to Section 7.1(h) and the reasons relating thereto, (2) the identity of the Third Party making the Acquisition Proposal and (3) all material terms and conditions of the Acquisition Proposal (including therewith copies of all material and relevant documents and agreement unredacted relating to such Acquisition Proposal and any proposed financing commitments with respect thereto (it being understood that the Company shall provide a written summary of all material terms of any such financing commitments that, pursuant to the terms of the engagement letter with the financing source thereto, cannot be provided in unredacted form); (D) during the four-Business Day period commencing on the date of Parent's receipt of such Superior Proposal Notice, the Company shall have made its Representatives reasonably available for the purpose of engaging in negotiations and shall have negotiated, and shall have caused its Representatives to negotiate, in good faith with Parent (to the extent Parent desires to negotiate) regarding a possible amendment of this Agreement or a possible alternative transaction so that the Acquisition Proposal that is the subject of the Superior Proposal Notice ceases to constitute a Superior Proposal; (E) after the expiration of the negotiation period described in clause "(D)" above, the Company Board shall have determined in good faith, after consultation with its outside legal counsel and financial advisor, and after taking into account any amendments to this Agreement proposed in writing by the Parent Parties as a result of the negotiations contemplated by clause "(D)" above, that such Acquisition Proposal continues to constitute a Superior Proposal; and (F) in the event of any change to any of the financial terms (including the form, amount and timing of payment of consideration) or any other material terms of such Acquisition Proposal, the Company shall, in each case, have delivered to Parent an additional notice consistent with that described in clause "(C)" above and a new notice period shall commence (except that the four Business Day notice period referred to in clause "(D)" above shall instead be equal to three Business Days during which time the Company shall be required to comply with the requirements of this Section 5.2 anew with respect to such additional notice); or

(ii) at any time prior to obtaining the Company Shareholder Approval, the Company Board may make a Change in Recommendation not related to an Acquisition Proposal if: (A) a Change in Circumstances has occurred; (B) the Company Board has determined in good faith, after consultation with its outside legal counsel, that, in light of such Change in Circumstances, a failure to effect a Change in Recommendation would reasonably be expected to constitute a breach of the Company Board's duties set forth in Section 2-405.1 of the MGCL; (C) such Change in Recommendation is not effected prior to the fifth Business Day after Parent receives written notice from the Company that includes (1) a statement confirming that the Company Board intends to effect such Change in Recommendation and (2) a reasonably detailed description of the Change in Circumstances; (D) during the four Business Day period after Parent receives such written notice, if requested by Parent, the Company engages in good faith negotiations, and shall have caused its Representatives to engage in good faith negotiations, with Parent to amend this Agreement, or to enter into an alternative transaction in order to obviate the need to make such Change in Recommendation; and (E) at the end of such four Business Day period, the Company Board determines in good faith, after consultation with its outside legal counsel and after taking into account any amendments to this Agreement proposed in writing by the Parent Parties as a result of the negotiations contemplated by clause "(D)" above, that, in light of such Change in Circumstances, a failure to effect a Change in Recommendation would reasonably be expected to constitute a breach of the Company Board's duties set forth in Section 2-405.1 of the MGCL.

39. The Merger Agreement also provides for a "termination fee" of $9,540,000 payable by the Company to NexPoint if the Individual Defendants cause the Company to terminate the Merger Agreement.

***The Proxy Statement Omits Material Information***

40. Defendants filed the Proxy Statement with the SEC in connection with the Proposed Transaction.

41. As set forth below, the Proxy Statement omits material information with respect to the Proposed Transaction.

42. First, the Proxy Statement omits material information regarding the Company's financial projections and the analyses performed by the Company's financial advisor in connection with the Proposed Transaction, KeyBanc Capital Markets, Inc. ("KeyBanc").

43. With respect to the Company's financial projections, the Proxy Statement fails to disclose: (i) all line items used to calculate Hotel EBIDTA; (ii) all line items used to calculate Total Corporate EBIDTA; and (iii) a reconciliation of all non-GAAP to GAAP metrics.

44. With respect to KeyBanc's Premiums Paid Analysis, the Proxy Statement fails to disclose: (i) the transactions observed by KeyBanc in the analysis; and (ii) the premiums paid in the transactions.

45. The Proxy Statement also fails to disclose a fair summary of any discounted cash flow analysis and net present value analysis performed by KeyBanc.

46. The disclosure of projected financial information is material because it provides stockholders with a basis to project the future financial performance of a company, and allows stockholders to better understand the financial analyses performed by the company's financial advisor in support of its fairness opinion. Moreover, when a banker's endorsement of the fairness of a transaction is touted to shareholders, the valuation methods used to arrive at that opinion as well as the key inputs and range of ultimate values generated by those analyses must also be fairly disclosed.

47. Second, the Proxy Statement omits material information regarding potential conflicts of interest of KeyBanc.

48. The Proxy Statement fails to disclose the timing and nature of the past services KeyBanc provided to NexPoint and its affiliates.

49. The Proxy Statement also fails to disclose the timing and nature of all communications regarding KeyBanc and/or its affiliates providing acquisition financing to NexPoint and its affiliates in connection with the Proposed Transaction.

50. Full disclosure of investment banker compensation and all potential conflicts is required due to the central role played by investment banks in the evaluation, exploration, selection, and implementation of strategic alternatives.

51. Third, the Proxy Statement fails to disclose whether the Company entered into any confidentiality agreements that contained standstill and/or "don't ask, don't waive" provisions that are or were preventing other potential acquirors from submitting superior offers to acquire the Company.

52. Without this information, stockholders may have the mistaken belief that, if these potentially interested parties wished to come forward with a superior offer, they are or were permitted to do so, when in fact they are or were contractually prohibited from doing so.

53. Fourth, the Proxy Statement fails to disclose the terms and values of all indications of interest and proposals submitted to the Company.

54. The Company's stockholders are entitled to an accurate description of the process leading up to the Merger Agreement.

55. The omission of the above-referenced material information renders the Proxy Statement false and misleading, including, *inter alia*, the following sections of the Proxy Statement: (i) Background; (ii) Reasons for the Company merger and recommendation of our board of directors; (iii) Opinion of our financial advisor; (iv) Summary of financial analyses of our financial advisor; and (v) Certain prospective financial information.

56. The above-referenced omitted information, if disclosed, would significantly alter the total mix of information available to the Company's stockholders.

## COUNT I

### Claim for Violation of Section 14(a) of the 1934 Act and Rule 14a-9 Promulgated Thereunder Against the Individual Defendants and Condor

57.     Plaintiff repeats and realleges the preceding allegations as if fully set forth herein.

58.     The Individual Defendants disseminated the false and misleading Proxy Statement, which contained statements that, in violation of Section 14(a) of the 1934 Act and Rule 14a-9, in light of the circumstances under which they were made, omitted to state material facts necessary to make the statements therein not materially false or misleading.  Condor is liable as the issuer of these statements.

59.     The Proxy Statement was prepared, reviewed, and/or disseminated by the Individual Defendants.  By virtue of their positions within the Company, the Individual Defendants were aware of this information and their duty to disclose this information in the Proxy Statement.

60.     The Individual Defendants were at least negligent in filing the Proxy Statement with these materially false and misleading statements.

61.     The omissions and false and misleading statements in the Proxy Statement are material in that a reasonable stockholder will consider them important in deciding how to vote on the Proposed Transaction.  In addition, a reasonable investor will view a full and accurate disclosure as significantly altering the total mix of information made available in the Proxy Statement and in other information reasonably available to stockholders.

62.     The Proxy Statement is an essential link in causing plaintiff and the Company's stockholders to approve the Proposed Transaction.

63.     By reason of the foregoing, defendants violated Section 14(a) of the 1934 Act and Rule 14a-9 promulgated thereunder.

64. Because of the false and misleading statements in the Proxy Statement, plaintiff and the Class are threatened with irreparable harm.

## COUNT II

### Claim for Violation of Section 20(a) of the 1934 Act
### Against the Individual Defendants and NexPoint

65. Plaintiff repeats and realleges the preceding allegations as if fully set forth herein.

66. The Individual Defendants and NexPoint acted as controlling persons of Condor within the meaning of Section 20(a) of the 1934 Act as alleged herein. By virtue of their positions as officers and/or directors of Condor and participation in and/or awareness of the Company's operations and/or intimate knowledge of the false statements contained in the Proxy Statement, they had the power to influence and control and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements that plaintiff contends are false and misleading.

67. Each of the Individual Defendants and NexPoint was provided with or had unlimited access to copies of the Proxy Statement alleged by plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause them to be corrected.

68. Each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control and influence the particular transactions giving rise to the violations as alleged herein, and exercised the same. The Proxy Statement contains the unanimous recommendation of the Individual Defendants to approve the Proposed Transaction. They were thus directly involved in the making of the Proxy Statement.

69. By virtue of the foregoing, the Individual Defendants and NexPoint violated Section 20(a) of the 1934 Act.

70. As set forth above, the Individual Defendants and NexPoint had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) of the 1934 Act and Rule 14a-9, by their acts and omissions as alleged herein. By virtue of their positions as controlling persons, these defendants are liable pursuant to Section 20(a) of the 1934 Act. As a direct and proximate result of defendants' conduct, plaintiff and the Class are threatened with irreparable harm.

## PRAYER FOR RELIEF

**WHEREFORE**, plaintiff prays for judgment and relief as follows:

A. Preliminarily and permanently enjoining defendants and all persons acting in concert with them from proceeding with, consummating, or closing the Proposed Transaction;

B. In the event defendants consummate the Proposed Transaction, rescinding it and setting it aside or awarding rescissory damages;

C. Directing the Individual Defendants to disseminate a Proxy Statement that does not contain any untrue statements of material fact and that states all material facts required in it or necessary to make the statements contained therein not misleading;

D. Declaring that defendants violated Sections 14(a) and/or 20(a) of the 1934 Act, as well as Rule 14a-9 promulgated thereunder;

E. Awarding plaintiff the costs of this action, including reasonable allowance for plaintiff's attorneys' and experts' fees; and

F. Granting such other and further relief as this Court may deem just and proper.

## **JURY DEMAND**

Plaintiff hereby requests a trial by jury on all issues so triable.

Dated: August 23, 2019            **RIGRODSKY & LONG, P.A.**

                                                   By: */s/ Gina M. Serra*
                                                         Brian D. Long (#4347)

**OF COUNSEL:**                        Gina M. Serra (#5387)
                                                         300 Delaware Avenue, Suite 1220

**RM LAW, P.C.**                        Wilmington, DE 19801
Richard A. Maniskas                Telephone: (302) 295-5310
1055 Westlakes Drive, Suite 300     Facsimile: (302) 654-7530
Berwyn, PA 19312                  Email: bdl@rl-legal.com
Telephone: (484) 324-6800           Email: gms@rl-legal.com
Facsimile: (484) 631-1305
Email: rm@maniskas.com              *Attorneys for Plaintiff*